IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 21-cr-10066-GAO |
| | ) | |
| CHUKWUNONSO "DOUGLAS" UMEGBO, | ) | |
| a/k/a JAMES ABBOTT, | ) | |
| a/k/a MICHAEL PHILIPS, | ) | |
| a/k/a RICHARD ARMANI, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Between June 2018 through February 2021, defendant Chukwunonso "Douglas" Umegbo participated in a scheme to steal more than $568,000 from at least 45 victims. To carry out the scheme, Umegbo opened at least 17 bank accounts at eight different banks using three different fake identities. When victims transferred funds into these fraudulent accounts, Umegbo stood ready to quickly withdraw the funds. His victims, who were often elderly, were deprived of thousands of dollars, and in some instances, their life savings. Even after he left the United States, Umegbo continued to participate in the scheme by contacting a co-conspirator in Massachusetts for bank accounts to which he could direct victims to send funds. For his conduct, Umegbo should be sentenced to 51 months imprisonment, 36 months of supervised release, restitution of $568,954.78, and forfeiture in the form of a money judgment for $568,954.78.[1]

---

[1] The Plea Agreement calls for the government to recommend a sentence of incarceration that is at the low end of the Guidelines sentencing range ("GSR") that is two levels below the GSR calculated by the Court at sentencing. Accordingly, the government will revise its recommendation consistent with the terms of the Plea Agreement should the Court's determination of the GSR differ from the Probation Office's findings in the Presentence Report.

1

**Offense Conduct**

Umegbo and his co-conspirators operated what is known as a "romance scam," a type of fraud in which conspirators create fictitious profiles on online dating or social websites. Conspirators then use these online dating profiles to capitalize on their (often elderly) victims' desire to find companions, gain their trust, and, once that trust is gained, direct victims to transfer money under false pretenses. In furtherance of the scheme, Umegbo opened bank accounts using fake identity documents to receive victim funds, quickly withdrew funds after victims deposited money into those accounts, and transferred the money to co-conspirators. Between June 2018 and February 2021, Umegbo used at least three fake identities—"James Abbott," "Michael Phillips," and "Richard Armani"—to open 17 bank accounts at various local banks, including Bank of America, Bay Coast Bank, Citizens Bank, Eastern Bank, J.P. Morgan Chase Bank, Santander Bank, TD Bank, and Webster Bank. More than $568,000 flowed through these accounts in less than three years.

But, unlike a typical "money mule" who may be willfully blind to the circumstances of his offense, Umegbo played an active role in laundering victim funds by using those funds to purchase cars at auction and ship the cars to Nigeria, where they were sold and the proceeds distributed to co-conspirators. Additionally, even after Umegbo left Massachusetts and moved back to Nigeria, he continued to direct the scheme by messaging his co-conspirator Kofi Osei for bank account information to which Umegbo and co-conspirators could direct victim funds. Umegbo asked for a range of accounts, including accounts able to receive wires in the hundreds of thousands of dollars. Umegbo continued to make these requests up until the day before Osei was arrested.

Among Umegbo's victims was a woman now in her early 60s from Bradenton, Florida, who sent more than $55,000 to accounts Umegbo personally controlled. This victim sent the funds under the belief that they were to buy drilling equipment for her online boyfriend, "Harry Mikesell." This victim was also led to believe that her own financial stability was in jeopardy because she agreed to co-sign one of "Mikesell's" bank accounts, and she paid money to purported banking authorities to unfreeze the account and restore her own credit. In total, this victim sent approximately $460,000 to accounts Umegbo and his co-conspirators controlled.

Another victim, who submitted a victim impact statement, recounts how she fell victim to the scheme following the loss of her husband of 57 years and how she had to return to nursing in her 80s, working 12-hour shifts, because she had lost her car, house, and retirement savings to this scheme. Her children have also submitted letters describing how conspirators isolated their mother and drove a wedge between them when the children tried to convince her she was the victim of a scam.

A third victim recounts in her victim impact statement not just the loss of her life savings, but the emotional and resulting physical trauma she has experienced as a result of Umegbo's scheme. These victims are but three examples of the more than 45 victims that transferred money to bank accounts that Umegbo controlled.

**Guideline Calculation**

The government agrees with the Probation Office's calculation that Umegbo's total offense level is 26 and that he falls in Criminal History Category I, yielding a Guidelines sentencing range of 63-78 months. PSR ¶¶ 42-62, 87.

Umegbo has objected to the inclusion of information regarding co-conspirators in the Presentence Report. *See* PSR, Def. Obj'ns 1-6. As noted in the Probation Office's response, this

information accurately reflects the evidence derived from the investigation and falls within the scope of Umegbo's jointly undertaken criminal activity. *Id.*, Prob. Off.'s Resp. to Obj'ns 1-6. What is more, the Guidelines calculation reflects only the loss of victim funds flowing directly into one of the fraudulent accounts Umegbo controlled, and not the more than $10 million attributable to the entire conspiracy. *Compare id.* ¶ 9 *and id.* ¶ 43.

Umegbo has also objected to the application of a 2-level enhancement under Section 2B1.1(b)(11)(A)(ii) for the possession or use of an authentication feature on the basis that the fake passports used to open the bank accounts at issue did not contain any holograms, fake visas, or entry/exit stamps. PSR, Def. Obj'n 7. Section 2B1.1(11)(A)(ii) provides that a 2-level increase applies "[i]f the offense involved (A) the possession or use of any . . . (ii) authentication feature." Application Note 10 to Section 2B1.1 provides that "authentication feature" has the meaning given in 18 U.S.C. § 1028(d)(1). That statute provides that an "authentication feature" means "any hologram, watermark, certification, symbol, code, image, sequence of numbers or letters, or other feature that either individually or in combination with another feature is used by the issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified." As noted in the PSR and explained in the Probation Office's response, the fake passports Umegbo used to open the accounts contained authentication features, including unique sequences of numbers and letters, as well as other security features. PSR ¶¶ 11-13; *id.* Prob. Off.'s Resp. to Obj'n 7. For example, the "Michael Philips" passport, purportedly from the Netherlands, was identified by the number "BJ8172D90." *Id.* ¶ 13. This alone is an authentication feature to which the enhancement applies, regardless whether there were any holograms or other security

4

features. Even more, as the Probation Office's response suggests, the passport likely contained additional authentication features to deceive bank employees into believing it was real.

Umegbo further objects to the absence of a 2-level decrease under Section 4C1.1. PSR, Def. Obj'n 8. A defendant qualifies for a reduction under the new "zero-point offender" Guideline only if he "meets all of the [ten] criteria" listed in the Guideline. U.S.S.G. § 4C1.1(a) (emphasis added). One of the disqualifiers is if the defendant "personally cause[d] substantial financial hardship." U.S.S.G. § 4C1.1(a)(6). While "[t]he application of subsection (a)(6) is to be determined independently of the application of [an enhancement for substantial financial hardship under] subsection (b)(2) of § 2B1.1," the Court "shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(f) of the Commentary to § 2B1.1" in determining "whether the defendant's acts or omissions resulted in 'substantial financial hardship' to a victim." U.S.S.G. § 4C1.1(b)(3) & cmt. 1. Among those factors are if a victim suffers "substantial loss of a retirement, education, or other savings or investment fund," has to make "substantial changes to his or her employment, such as postponing his or her retirement plans," or experiences "substantial harm to his or her ability to obtain credit." U.S.S.G. § 2B1.1(b)(3) App. n. 4(F).

Additionally, as outlined in the Presentence Report, the purpose of Umegbo's scheme was to deprive victims of their money. And, indeed, more than 45 victims sent Umegbo more than $568,000, including victims who took out loans or withdrew from their retirement accounts to provide the funds. PSR ¶¶ 16, 23. One victim lost more than $460,000. *Id.* ¶ 19. Absent Umegbo opening accounts in the United States, individual victims would not have sent money to his accounts because they would have been leery of sending money overseas. *E.g.*, PSR ¶ 32 (Umegbo messaged that victim "cannot pay outside USA"). Likewise, victim banks would have

5

detected the fraud given the increased scrutiny on foreign wires. In short, without Umegbo opening fraudulent accounts here, the scheme would not have succeeded. What is more, Umegbo's messages with his co-conspirator Kofi Osei show that Umegbo played an active role in procuring account information for fraudulent bank accounts that he, or another co-conspirator at Umegbo's direction, provided to victims and directed them to send money to those accounts. *E.g.*, PSR ¶¶ 29-36. Thus, even if Umegbo did not communicate directly with victims, he nevertheless personally caused substantial financial hardship and is ineligible for a 2-level decrease under Section 4C1.1. *See, e.g.*, *United States v. Abbas*, No. 20-cr-10016-LTS, Dkt. 380 (D. Mass. Mar. 14, 2024) (finding defendant ineligible under § 4C1.1 because he personally caused substantial financial hardship by opening bank accounts and receiving victim funds, despite not having direct communications with victims).

**Sentencing Recommendation**

The government recommends a sentence of 51 months imprisonment, 36 months of supervised release, restitution of $568,954.78, and forfeiture in the form of a money judgment for $568,954.78.

1. *The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.*

Umegbo's crime was serious and caused significant harm. He and his co-conspirators capitalized on lonely, often elderly, individuals' desire to find companions, using promises of love to persuade victims to wire large sums of money into accounts that Umegbo and his co-conspirators opened using counterfeit foreign passports. Some of these victims depleted their life savings. Beyond the financial harm, victims have suffered significant emotional and even physical harm. While Umegbo may not have wooed the victims, he surely understood that they were wiring large sums of money at his direction to accounts he and co-conspirators opened in

the names of individuals who did not exist. Once victims wired money to these accounts, Umegbo stood ready to collect, withdrawing the funds within days of deposit. This readiness to withdraw the money so promptly is an indication of the degree of coordination among the members of the conspiracy, which, as noted above, obtained millions of dollars from victims. Further, even after he left the United States, Umegbo furthered the scheme by directing others to provide him with bank account information that he or another conspirator provided to victims. The losses the fraud caused in such a short period, the number and identity of the victims, and the sophisticated manner in which it was carried out are measures of the seriousness of the offense and counsel in favor of a lengthy term of imprisonment.

Additionally, nothing in Umegbo's background mitigates his culpability. He was in the United States as a self-funded student obtaining a master's degree from UMass-Dartmouth when he joined the scheme and had no need to steal. PSR ¶ 78.

> 2. *The Need for the Sentence Imposed To Promote Respect for the Law and to Provide Just Punishment for the Offense.*

Here, Umegbo's motive was purely personal gain. He understood that his gain in this scheme represented another's loss. He did not act out of coercion, duress, or desperation. His participation was not the result of a momentary lapse in judgment or weakness of will. Rather, he demonstrated a prolonged willingness to engage in an exploitation of victims for the sake of personal profit. For a financial crime, these factors point toward the highest degree of culpability.

> 3. *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct*

General deterrence is particularly important here. Online scams taking advantage of the lonely and elderly are rampant. *See, e.g.*, Federal Trade Commission, "Romance scammers' favorite lies exposed," Feb. 9, 2023, available at https://www.ftc.gov/news-events/data-

[visualizations/data-spotlight/2023/02/romance-scammers-favorite-lies-exposed#ft1](visualizations/data-spotlight/2023/02/romance-scammers-favorite-lies-exposed#ft1) (reported losses from online romance scams reached "staggering" $1.3 billion across 70,000 victims in 2022).[2] The scam is easy to complete, and the huge amounts of money make it all too attractive to carry out. Often, those "wooing" the victims are located overseas, out of the reach of the government's jurisdiction. But, they depend on participants in the United States, like Umegbo and his co-conspirators, to accomplish the scheme. Umegbo's sentence should reflect the need to deter the many others who might otherwise engage in the same sort of misconduct if there is to be any chance of driving down the billions in losses to victims annually. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool and calculated then sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (internal quotation omitted).

4. *The Need to Avoid Unwanted Sentencing Disparities Among Defendants Guilty of Similar Conduct*

The table below summarizes the sentences that similarly situated defendants have received in this district:

---

[2] *See also* Federal Trade Commission, "Reports of romance scams hit record highs in 2021," Feb. 10, 2022, available at https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/02/reports-romance-scams-hit-record-highs-2021 (reported losses reached $547 million in 2021); Federal Trade Commission, "Romance scams take record dollars in 2020," Feb. 10, 2021, available at https://www.ftc.gov/news-events/blogs/data-spotlight/2021/02/romance-scams-take-record-dollars-2020 (reported losses reached $304 million); Federal Trade Commission, "New FTC Data Show Consumers Reported Losing More Than $200 Million to Romance Scams in 2019," Feb. 12, 2020, available at https://www.ftc.gov/news-events/press-releases/2020/02/new-ftc-data-show-consumers-reported-losing-more-200-million (reported losses reached $201 million, up 40% from 2018).

| Case Name | Approx. Loss Caused | Sentence Received | Other Factors |
|---|---|---|---|
| *United States v. Kofi Osei*, No. 21-cr-10064-IT | $4.3 million | 54 months | Recruited at least 4 others to scheme for total losses exceeding $9 million |
| *United States v. Esogie Osawaru*, No. 20-cr-10209-LTS | $1.3 million | 6 months | Listed as witness in *United States v. Omoruyi*; other sentencing factors under seal |
| *United States v. Francis Okafor*, No. 22-cr-10095-DPW | $1.1 million | 24 months | Recruited to scheme by Osei; other sentencing factors under seal |
| *United States v. Mark Okuo*, No. 21-cr-10309-LTS | $1 million | 55 months | Obstructed justice after arrest, including by telling witness to lie to law enforcement |
| *United States v. Florence Musau*, No. 21-cr-10190-ADB | $956,000 | 44 months | Also received fraudulent pandemic unemployment assistance |
| *United States v. Kelechi Umeh*, No. 23-cr-10013-WGY | $878,000 | 40 months | CHC II; also received fraudulent pandemic unemployment assistance |
| *United States v. Mike Amiegbe*, No. 21-cr-10339-IT | $828,000 | 6 months prison and 3 months home confinement | Testified at trial in *United States v. Omoruyi* |
| *United States v. Nosayamen Iyalekhue*, No. 20-cr-10208-RWZ | $813,000 | 63 months | CHC III; also received fraudulent pandemic unemployment assistance |
| *United States v. Macpherson Osemwegie*, No. 21-cr-10219-DJC | $686,000 | 32 months | CHC II; also received fraudulent pandemic unemployment assistance |

While the amount of victim funds flowing through Umegbo's accounts is less than these defendants, that factor is not the sole consideration. Indeed, the most comparable sentence is that of Kofi Osei, who received a sentence of 54 months of incarceration, because he and Umegbo worked so closely together to carry out the scheme. The evidence demonstrates that Umegbo and Osei regularly messaged each other about accounts. Frequently, Umegbo sought additional bank accounts to which he could direct victim funds. While Osei received a 3-level role enhancement for being a manager or supervisor for recruiting additional conspirators to open

fraudulent bank accounts, he did so largely because Umegbo was hounding him in WhatsApp messages to provide additional bank accounts. Indeed, a significant portion of Osei's $4.3 million loss likely arose from Umegbo directing victim money to accounts Osei controlled after Umegbo returned to Nigeria. This amount was not included in Umegbo's Guidelines calculation, because Osei likely received victim funds through other conspirators as well and it is too difficult to parse each transaction in his many accounts. Nevertheless, where Umegbo and Osei worked in tandem, under the Section 3553(a) factors, a comparable sentence to Kofi Osei is warranted here.

Umegbo argues that the Court should depart from the Guidelines because he is not eligible to participate in Bureau of Prisons programming that may reduce his sentence. PSR, Def. Obj'n 10. However, Osei was also not a citizen and thus faced the same consideration.

**Conclusion**

For the reasons herein, the government recommends a sentence of 51 months imprisonment, 36 months of supervised release, restitution of $568,954.78, and forfeiture in the form of a money judgment for $568,954.78.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By: /s/ Kristen A. Kearney
Kristen A. Kearney
Assistant U.S. Attorney

Dated: March 29, 2024

## **CERTIFICATE OF SERVICE**

       I, Kristen A. Kearney, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                    By:    */s/ Kristen A. Kearney*
                                                 Kristen A. Kearney